## District Court.

### MAINE, July, 1824.

Elwell
v.
Martin et al
} ASSAULT AND BATTERY. RIGHTS OF MASTER AND SEAMAN.

WARE, District Judge. This is a libel for an assault
and battery, brought by Elwell, one of the crew of the
brig Mentor, against Martin, the master, and Storer
and Fales, the two mates. Elwell complains against
the respondents that on the 25th of June last they jointly
made an assault upon him with great violence, and in-
flicted, among other injuries, the very serious one of
dislocating his left shoulder. To this libel the respon-
dents have put in several answers, admitting and justi-
fying the assault as necessary and proper correction to
punish the mutinous and disobedient conduct of the li-
bellant, and denying that the dislocation of the arm was
the effect of their assault. Elwell, in his replication,

MAINE,
1824.

Elwell
v.
Martin.

re-affirms the matters stated in his libel, with considerable amplification, and denies the sufficiency of the justification.   The cause has been very fully and ably argued on both sides, and now stands for decision.

The affair which gave occasion to this prosecution took place at Turks Island, after the brig had loaded, and was in the act of departing from the port.

[The learned Judge here gave a minute account of the testimony ; but the law of the case may be distinctly understood from what follows.   It is sufficient to state, that the sailor having been drinking on shore, was refused the usual allowance of grog, when he came on board—that he demanded it of Fales the second mate, with much insolence.   That he brandished in his hand an open knife, with which he had been eating his dinner, using threatening language :  Fales struck him again with his stick—he put up his knife and dared Fales to a fight :  Fales clenched him, and a scuffle ensued.   Storer, the chief mate, came up and parted them, and ordered Elwell forward.   He refused, with an oath, to go till he had his grog.  The Captain came on deck, and, inquiring if there was mutiny, kicked Elwell three times ;  the third time with such violence as to prostrate him on the deck, and then called out to confine him. As he was rising on his feet, the captain and both mates seized him, cast him down, and lashed him to the boat, or a spare topmast on deck.   He was confined in that situation one hour, apparently in much pain, and then released by Storer, and sent below.   The injury to the shoulder was done when he was the second time thrown on the deck; but the nature or degree of the injury was not ascertained till fourteen days afterwards, when he arrived in Portland.   It was stated by the surgeons that

it would be two or three months before he could reco-
ver the use of his arm, and that it would always be more
liable to a similar injury.]

The affray commenced between Elwell and the se-
cond mate, Fales. When Elwell, after his grog was re-
fused, continued to demand it, and refused to go for-
ward on his order, Fales took upon himself to chastise
him for his insolence and disobedience. That Fales was
correct in refusing to deliver the customary allowance
of grog, is admitted. It seems to have been in confor-
mity with the orders of the captain. But it is not
equally clear that he is as fully justifiable in assuming to
himself the authority of inflicting corporeal chastisement
on the man for his disobedience, when the captain was
at his elbow. It was not a case where the safety of the
vessel or the discipline of the crew required the instant
exertion of such authority. And it may be here re-
marked, that though the law does indeed justify the mas-
ter in chastising on the spot a reluctant or disobedient
seaman, I am not aware that this authority is extended to
his subordinate officers, when he is present, especially
to the lowest on board the vessel. Such things, often
without doubt, are done and pass off, and if the pun-
ishment were merited and not unreasonably severe, I do
not say that Courts will give much encouragement to a
seaman who should ask for damages. But I am now in-
quiring for the legal rights of the subordinate officers in
the presence of the captain, and I am free to say that
I do not know the law which in such cases invests the
inferior officer with such powers. The ancient sea
laws are curiously directory in fixing the limitations of
this authority in the captain, and the authority itself is
in some of them rather suggested than directly given.

MAINE,
1824.

Elwell
v.
Martin.

Consulat de la Mer. s. 416.   Laws of Oleron, art. 12.
Cleirac, p. 48.   Laws of Wisbury. art. 24.   Ordo-
nance de la Marine, b. 2. t. 1. art. 22.; 1 Val. 447.
But there is not within my recollection an intimation
that any such authority is entrusted to the inferior offi-
cers of the ship.   I am by no means satisfied that the
interests of commerce, the security of navigation, or
the good discipline of ships' crews require it.   On the
contrary, it seems to me that such a distribution and ex-
tension of power would be the parent of confusion
rather than order, and by breaking in upon the unity of
authority, would tend rather to the relaxing, than the
sustaining of good discipline.   To me it seems that a
good ship master should allow no person but himself
to inflict a blow on a seaman in his presence.

If such be the law it takes some shades from the mis-
conduct of Elwell in the scuffle which took place be-
tween him and Fales.   It does not excuse him from per-
severing in the demand of his grog after it had been re-
fused, much less does it excuse his insolence and diso-
bedience to his superior.   If he was aggrieved, his ap-
peal lay to the master.   But he was probably conscious
of the propriety of the officer's conduct, and well satis-
fied that the refusal of Fales would be confirmed by the
captain.   It, however, places Mr. Fales, when he com-
menced the assault, in the legal attitude of an aggres-
sor.

When Storer came up and parted the combatants, he
was merely in the execution of his official duty, but the
libellant added to the aggravation of his previous mis-
behaviour, the refusal to obey the proper and just order
of this officer.

When the affray commenced, the captain was in the

MAINE,
1824.

Elwell
v.
Martin.

cabin. He was called up by the noise on deck, and ask-
ed if there was mutiny, to which one of the officers re-
plied that it looked like it. This was the only inquiry
he made into the cause or nature of the quarrel. But
as he was within hearing during the whole, he may well
be supposed to have understood the origin and character
of the affray. He proceeded to punish the delinquent
on the spot.

It is not difficult to state in general terms the nature
and extent of the master's authority in such cases. It is
his duty to preserve discipline on board his ship, and it
is his right to correct the disobedience or insolence of a
seaman by moderate chastisement; his authority in this
respect being analogous to that of a parent over his chil-
dren, or a master over his apprentice. Abbot on Ship-
ping, 187. Am. ed. vol. 1. p. 447. But though there is
little difficulty in stating the right of the master in gene-
ral terms, it is not so easy in practice to fix the precise
point at which a just and wholesome exercise of domes-
tic discipline passes into a criminal abuse of power. In
such cases I am not insensible that the condition of the
captain is to be looked upon with indulgence. The oc-
casion that calls into activity his authority, usually re-
quires that it should be exercised often with prompti-
tude, under circumstances of strong excitement, with
but little time for reflection, and little opportunity of
weighing in critical scales the just amount of punishment
against the magnitude of the offence. Something under
such circumstances is to be indulged in his favour to
the infirmity of human nature. To hold him responsible
for what another person, who looked on as a cool and
unconcerned spectator, might think a moderate excess.
would be trying his conduct by too severe a test: if

MAINE,
1824.

Elwell
v.
Martin.

would give too much encouragement to not the best class of mariners to enter prosecution for trivial injuries, and have a tendency to break down all authority and discipline. It was very justly urged by the libellant that the greatest discretion is not to be expected from the humble condition of a common sailor, but that the usefulness of the class to which he belongs, his hard services and small reward, and the character of frankness, and thoughtless impetuosity, which seems to be naturally created by the nature of his employment, justly require that we should look on his failings with sentiments of kindness, and not severity. To this argument it may be replied, with equal truth, that when the misbehaviour of the seamen has called into action the correctional power of the master, the like reasons claim for him a like indulgence of judgment in favour of the necessary exercise of discretionary authority.

In the present case there was misbehaviour on the part of the libellant that unquestionably justified correction, and the true question is whether, in inflicting summary justice, the officers have passed the limits beyond which the indulgence of the law cannot consistently with justice and sound policy follow them. In my opinion, they have. It has been argued for the respondents that the master under the circumstances having the right to chastise Elwell, that the mode of punishment being a legal and proper one, and the dislocation of a limb not being intended, nor likely to occur in the mode of correction adopted, the officers ought not to be holden responsible for an accidental and unexpected injury. There is certainly a great degree of plausibility in this mode of considering the case. But will the facts warrant it? When the master in this way takes his stand upon his strict legal rights,

I must be permitted to say that he showed, as is perhaps too apt to be the case, quite as much alacrity as was suitable in resorting to severe measures. From all the evidence the dislocation seems to have been effected when Elwell was thrown down to be lashed. The master and both mates had then hold of him, and assisted in laying him down, and making him fast. With such odds as the strength of three against one, it would seem that with ordinary caution in the application of their force, Elwell might have been secured without the employment of such violence as must have been exercised to produce the injury he sustained. That degree of violence was unnecessary and unwarrantable, and if an injury was done beyond what was intended, though as happening partly from misadventure, it may not call for vindictive, no reason is perceived why the authors of it should not be holden answerable for actual pecuniary damages. Under all the circumstances, to this amount, I think the damages ought to be limited.

It is contended, on the part of the respondent's counsel, that whatever may be the decision as to the master, Storer and Fales, who acted in obedience to his order, can in no event be held responsible. They would indeed be justified in confining Elwell, and this was the extent of the master's order. But in executing it, if a serious injury was inflicted from their unnecessary harshness or want of caution, they must be held to answer for it. They were jointly engaged in doing the wrong, and I do not perceive any reason why they should not be held to respond the damages. Decree, $80 damage— no costs.